1          UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF MISSOURI
2

3  UNITED STATES OF AMERICA,

4              Plaintiff,          Docket No. 4:14-cr-00127-RK-05

5    v.

6  BRAHM DEWAN,                    Kansas City, Missouri
                                    January 29, 2019
7              Defendant.

8

9                  ..........................

10             TRANSCRIPT OF SENTENCING
        BEFORE THE HONORABLE ROSEANN KETCHMARK
11              UNITED STATES DISTRICT JUDGE

12  APPEARANCES:

13   For the Plaintiff:          Mr. Patrick James O'Connor
                                  Wagstaff & Cartmell
14                                4740 Grand Avenue
                                  Suite 300
15                                Kansas City, Missouri 64112

16
     For the Defendant:          Mr. Joseph M. Marquez
17                                United States Attorney's Office
                                  400 East 9th Street
18                                Suite 5510
                                  Kansas City, Missouri 64106
19

20

21
         Proceedings recorded by machine shorthand, transcript
22  produced by computer-aided transcription.
    _____
23             Jean M. Crawford, RDR, CRR
                United States Court Reporter
24              400 East Ninth Street, #8420
                Kansas City, Missouri 64106
25                    816.512.5642

1    (Proceedings commenced at 2:09 p.m.)

2    THE COURT:  This afternoon the Court is calling case

3    No. 14-0127-05, United States of America versus Brahm Dewan.

4    Will the parties please enter their appearances.

5    MR. MARQUEZ:  Joseph Marquez for the government,

6    Your Honor.

7    MR. O'CONNOR:  PJ O'Connor for Brahm Dewan, who

8    appears in person, Your Honor.

9    THE COURT:  Today we're here for the sentencing of

10   Mr. Dewan after he pled guilty on May 2nd of last year to the

11   one count of an information charging him with misprision.  A

12   PSR was ordered and generated and distributed to the parties.

13   And a revised PSR was generated and filed September 25th, 2018,

14   by adjusting the base offense level pursuant to 2X4.1.  Also on

15   that date, an addendum was filed setting forth that other than

16   the changes to the guidelines pursuant to 2X4.1, there are no

17   written objections by either party.

18   Mr. O'Connor, have you had an opportunity to review

19   the presentence investigation report, the revision, carefully

20   with Mr. Dewan?

21   MR. O'CONNOR:  Yes, Your Honor.

22   THE COURT:  Do you have any changes or

23   clarifications to the factual content of the PSR?

24   MR. O'CONNOR:  No, Your Honor.

25   THE COURT:  Mr. Dewan, is that accurate, you've had

1  the opportunity to review the PSR carefully, and you do not

2  have any changes to the factual content?

3          THE DEFENDANT:  Yes, ma'am.

4          THE COURT:  And, Mr. O'Connor, do you have any oral

5  objections to the PSR?

6          MR. O'CONNOR:  No, Your Honor.

7          THE COURT:  Do you, Mr. Marquez?

8          MR. MARQUEZ:  No, Your Honor.

9          THE COURT:  In looking at page 13 of the PSR, it

10 sets forth a base offense level of 19.  And a three-level

11 reduction is applied pursuant to 3E1.1 for acceptance of

12 responsibility, yielding a total offense level of 16.  When you

13 look at the criminal history, Mr. Dewan's criminal history

14 score is 0, which establishes a criminal history category of I

15 as reflected on page 14.  And on page 17, under section 82, a

16 total offense level of 16 and a criminal history category of I

17 renders an advisory guideline range of 21 to 27 months.

18          Mr. O'Connor, do you agree with those calculations

19 in the PSR?

20          MR. O'CONNOR:  Yes, Your Honor.

21          THE COURT:  Do you, Mr. Marquez?

22          MR. MARQUEZ:  Yes, Your Honor.

23          THE COURT:  Having established the advisory

24 guideline range, let's now turn to the sentencing factors under

25 18 USC 3553 in which the Court is required to reflect on and

1  apply to the Court's reasoning for imposing a sentence that is

2  sufficient but not greater than necessary to comply with the

3  provisions of the statute.

4         The Court would note that the defense has filed a

5  sentencing memorandum in which they ask for probation and give

6  reasons for that request.  And the government has also filed a

7  memorandum in which they are requesting a low end of the

8  advisory guideline range.  The Court did have an opportunity to

9  visit with counsel in chambers to clarify the government's

10  position.

11         Mr. Marquez, did I articulate the government's

12  position properly?

13         MR. MARQUEZ:  You did, Your Honor.  In my sentencing

14  memorandum, it actually talks about the low end of the

15  statutory range, and that was meant to be the low end of the

16  guideline range.

17         THE COURT:  All right.  I'd like to give both

18  attorneys an opportunity to make any additional arguments and

19  also give Mr. Dewan an opportunity as part of his allocution to

20  make any statements regarding the appropriate sentence in this

21  case or any other relevant information.

22         Mr. O'Connor, do you want to proceed first or would

23  you like the government to go first?

24         MR. O'CONNOR:  Judge, I can -- either way is fine

25  with me.

1          THE COURT:  Okay.  Will you and Mr. Dewan come to

2     the lectern, please.

3          Do you have any witnesses, exhibits outside of

4     argument?

5          MR. O'CONNOR:  No, Your Honor.

6          THE COURT:  You may proceed.

7          MR. O'CONNOR:  Judge, as Mr. Dewan stands in front

8     of you, he's 51 years old.  He is single.  He is from India

9     originally.  He has an ex-wife in India and a daughter who's

10    22.  He has no alcohol, drug or mental health issues.  There is

11    some debate about his status here.  And our belief or position

12    is is that he does have asylum here in this country because of

13    issues with his sexuality.  We are unable to confirm that or

14    have documentation on that issue but that we do believe that

15    will be an issue for him going forward.

16          Judge, I know that the Court must consider the

17    factors under 3553.  And one of those factors is the

18    guidelines, which is essentially 21 to 27 months.  I would

19    strongly encourage the Court to consider a sentence under that,

20    including a sentence of probation in this particular case for

21    the following reasons.

22          Mr. Dewan is much different than all other

23    defendants charged in his case, specifically, the more culpable

24    defendants, the defendants who had the authority and control of

25    these businesses, the ones that created the illegal purposes

for these businesses, and the ones who directed him to do the things that he did. He never had any kind of decision making authority within this business for their illegal purposes. He never had any control of the money or finances in his own accord. And I think in terms of looking at his codefendants, Judge, he came to this country on a visitor's visa. He would stay approximately four to six months at a time. He was introduced to Saleem where he started working as a packer. He was essentially paid $0.05 a bag for packing. He became a reliable, trustworthy employee, extremely vulnerable and naive as being a native of India when he came over here.

Our position has been throughout this entire case that he was used, manipulated by the codefendants, who were more culpable and had the illegal purposes. And I think along the way, Judge, him not having any position of authority, he was essentially a worker for these people. He believed for a long time that these businesses were legitimate. He looked up to these people. He thought they were successful. He thought they were running legitimate businesses. And I think at the beginning, they were. And I think it would prove over time that a lot of these individuals were running successful, legitimate businesses before they got involved in this synthetic marijuana stuff.

Judge, they created a story line for this defendant and others that, as the DEA and others started reining in these

synthetic drugs and making them officially illegal under the
Controlled Substances Act, they would move from state to state.
They would move different places.  They would show Mr. Dewan
documents.  They had lawyers show him documents that what they
were doing was legal at different times.

Mr. Dewan, Your Honor, pled guilty to misprision
because along the way when he was asking questions -- of
course, he was starting to recognize that things weren't adding
up.  But even -- even during those periods of time, Your Honor,
one of the other codefendants who pled guilty to misprision,
Mickey Avalos, you know, even her role in this offense was so
much greater than his in that she was in a relationship with
Saleem.  She was a payroll manager.  She spoke Spanish.  She
handled the migrant workers.  She was on the inside.  She knew
what was going on.

She even asked Mr. Dewan at different times -- once
they signed up this bank account where quite a bit of money
flowed through that account.  He never had access to the bank
account in any official capacity, other than his name being on
the documents.  He never controlled the money going in or going
out.  But she would ask him, hey, you're getting ready to leave
to go back to India, will you sign a few checks for us?  Which
meant she knew later that someone was going to put whatever
amounts they were going to put on those checks and send those
checks through.  And even in that circumstance, Judge, he was

1    told that they were trying to apply for some kind of commerce

2    visa for one of the main codefendant's fathers is how they got

3    him to open the bank account.

4         So, Judge, I look at, you know, the plea agreements

5    in the other cases.  I know that each of those defendants have

6    binding pleas of some sort.  I know that the Court has to both

7    accept the sentence at the time of the sentencing hearing in

8    order to accept the pleas, but, at least in theory, if someone

9    like Saleem and the control, the money, the authority,

10   everything he had and did, if he's facing four years, along

11   with Siddiq, and Mr. Khan is facing between three and five, and

12   you look at their roles collectively, or individually, compared

13   to where he is, I think a sentence of probation is appropriate.

14        You know, my client, as he stands here, never had

15   any substantial compensation for what he did.  You know, his

16   credit -- he owes $9,000 on a credit card.  We're talking about

17   other individuals in this case, Your Honor, who made millions

18   of dollars of profit from their illegal activity.  And they

19   basically used Mr. Dewan.  Judge, he does have two jobs right

20   now that he's currently working.  He's working for Amazon doing

21   deliveries approximately six hours a day.  He's working for

22   Lyft driving people around in California approximately six to

23   seven hours a day.  Hopefully, we know or believe that those

24   are legitimate businesses, and he can continue to make a

25   legitimate income.

1          Judge, I would ask this Court to sentence Mr. Dewan
2  to a term of probation or consider some type of a split
3  sentence or house arrest or fashion any kind of a sentence it
4  deems appropriate.  But in light of where the other defendants
5  are, in light of his role in the offense and his
6  vulnerabilities, naivety along the way, I would strongly
7  encourage the Court to sentence Mr. Dewan to probation.

8          THE COURT:  On page 8 of the PSR, it talks about the
9  defendant being involved in the smurfing.  Is his involvement
10 simply that he picked up packages in LA, or did it involve more
11 than that?

12         MR. O'CONNOR:  Yes, Judge.  I believe he was asked
13 to hit certain residents along the way --

14         The houses where you went individually for --

15         THE DEFENDANT:  When I came, they gave me the --
16 when I came over here, they gave me the van, which was used for
17 the work, for my transportation.  So on the way to work, I had
18 to pick the packages from the house to take it to there.

19         THE COURT:  Some of the folks earned money for doing
20 the package deliveries.  Do you know if he received additional
21 money for --

22         THE DEFENDANT:  No, ma'am.

23         THE COURT:  -- transporting the packages?

24         THE DEFENDANT:  No, ma'am.

25         THE COURT:  And are there any pay records that show

1    that Mr. Dewan simply received wages from this enterprise

2    rather than any other benefit, travel, any other compensation?

3              MR. O'CONNOR:  I don't believe so, Judge.  But I

4    would -- you know, if the Court would like to inquire with

5    Mr. Dewan -- my understanding is is that along the way that he

6    was paid cash, starting at the beginning at like $0.05 a

7    package.  That kind of continued to be the same course of

8    action for a long period of time.  At times, he would ask them

9    for additional money for like living expenses, things like

10   that.  And they would routinely give him, you know, cash for

11   this or cash for that.  But I asked him about large quantities

12   of money, did they give you large quantities of cash, and the

13   answer was always no.

14             He essentially like lived with them or lived with

15   other people that he was working with during the periods of

16   time.  They did provide him oftentimes with a place to stay,

17   but it was kind of a pay-as-you-go type of situation.

18             THE DEFENDANT:  Yes.

19             THE COURT:  And was Mr. Dewan working from 2011 to

20   2014, or what were his days of involvement with -- his years of

21   involvement with the K2 distribution?

22             MR. O'CONNOR:  I believe, Judge, he was -- when he

23   was here on his visas, which were kind of off and on during

24   those periods of time, I believe -- when he was here, he was

25   working for them full time.

1          THE DEFENDANT:  Yeah.

2          THE COURT:  So would that be during the period of

3     2011 to 2014?

4          MR. O'CONNOR:  Judge, he believes until -- he was

5     going -- here four to six months, back to India, all the way

6     till about 2014.  And then he believes in 2014 is when the

7     asylum part of it took place.  He didn't go back.

8          THE COURT:  Okay.  And then when was his last

9     employment date with this group?

10         MR. O'CONNOR:  Judge, we believe after talking with

11    the government, it was -- it was when the business was shut

12    down, which he believes was June or July of 2014.

13         THE COURT:  All right.

14         MR. O'CONNOR:  Judge, there was one other thing I

15    forgot to mention in my pitch on the 3553 factors was that he

16    did take advantage of the opportunity of sitting down and

17    speaking with the government and cooperating in this case.  And

18    that also led to the plea agreement in this case.  And I

19    believe he was truthful with the government in those

20    proceedings as well.

21         THE COURT:  All right.  And, Mr. Dewan, I'll give

22    you a chance to make any statements, but I'd like to hear

23    arguments from the government first, and then I'll give you an

24    opportunity.

25         MR. O'CONNOR:  Thank you, Judge.

1    MR. MARQUEZ:  Judge, I will say I would agree with

2  Mr. O'Connor that this defendant is different from the other

3  defendants in the case.  You have somewhat of a snapshot of the

4  overall complexity of this particular case by looking at the

5  PSR.  Obviously, this was -- for the other defendants, in

6  particular Mohammed Saleem, Arif Siddiq and Shakeel Khan, those

7  were the ones that were making a large amount of money in a

8  small amount of time.

9          The information that Mr. O'Connor gave you about

10  Mr. Dewan is true.  He basically lived in the basement of Sunny

11  Saleem's residence.  He started off, you know, packaging these

12  little 3 gram packages of K2 for sale.  Moved up somewhat in

13  the business because he had always been with Mr. Saleem, and he

14  was trusted to the point where, you know, they asked him to go

15  ahead and open up a couple of bank accounts, to which we agree

16  and believe that Mr. Dewan did not have any access to, wasn't,

17  you know, taking moneys out of those accounts.

18          In the grand scheme of things, those guys, Saleem,

19  Siddiq and Khan, were using Mr. Dewan because they had so many

20  different bank accounts, and so much money was moving through

21  these different bank accounts to somewhat try to throw off the

22  trail of the IRS because, you know, when you start depositing

23  more than $10,000 at a time, you know, it raises alarm bells

24  with the banks and with IRS.

25          So as you can see in the PSR, that was being done on

1  a grand scale with multiple other people, not just Mr. Dewan.

2  So in that sense, Judge -- and I think I said this earlier to

3  the Court -- he was being used by the main defendants in this

4  particular case.  So his status is a little bit different than

5  those.  He -- I would say this to the Court:  He is -- out of

6  the five that you have in this indictment in front of you, he

7  is by far the least culpable of all of these people.

8          Mr. O'Connor did mention Mickey Avalos, who pled to

9  the same charge.  I would agree that there is a difference

10 between those particular people, this defendant and Mickey

11 Avalos, because Mickey Avalos was closer to Saleem.  She was

12 his paramour.  She helped run the manufacturing operation.  And

13 she did and was in charge of getting Hispanic workers out in

14 California to come and work.  Obviously, Mr. Dewan does not

15 know Spanish.  He was not in charge of those workers.

16 Ms. Avalos was.  And you'll hear about that at her sentencing.

17 So there is a difference between these defendants, Judge.

18          You kind of inquired about the payroll records.

19 From our investigation, most of these people were paid in cash.

20 And Mr. Dewan was one of those people that were paid in cash.

21 This was not a business from the high end, from those guys that

22 were running it, where they had payroll records and they

23 submitted, you know, timely taxes to the government, you know,

24 every quarter.  It wasn't one of those businesses because it

25 was really a cash only business.  These guys were making --

1  basically making money hand over fist during this time frame

2  when they were out in California.  They made good money when

3  they were in Kansas City.  They made decent money when they

4  were down in Texas.  But when they got to California, that

5  portion of it kind of exploded, and they were making large sums

6  of money.  And it was cash money.  So they weren't operating as

7  a regular business.  They weren't -- you know, they didn't have

8  good business records because it was really a cash only thing.

9  So those things are true about Mr. Dewan.

10        Again, the government's sentencing memorandum talks

11  about the low end of the guidelines.  Generally speaking, in

12  cases like this, we usually ask for the guidelines because the

13  guidelines have been deemed, you know, fair and just.  There

14  are times when the courts and defense attorneys, defendants,

15  ask for adjustments to those guidelines.  This would be a case

16  that those adjustments would probably be fair.  But I will

17  leave it up to the Court to make that ultimate determination as

18  to what sentence Mr. Dewan gets.

19        Another thing that we had talked about too, Judge,

20  at the change of plea was his immigration status.  That's

21  something too that the Court may need to take into

22  consideration.  And I don't know if that's a plus or a minus

23  for Mr. Dewan, but we explained to him that, you know, there

24  are going to be some sort of immigration consequences to

25  pleading guilty in this case, whether he gets probation or

1  whether he gets, you know, a sentence of -- any kind of
2  sentence, simply by the fact that that situation has not been
3  taken care of.

4          He was in the middle -- it's my understanding he was
5  in the middle of applying for asylum.  It hadn't gone through.
6  I don't believe that that's the case that it had gone through.
7  But there was a process that they were involved in.  I had
8  conversations with Mr. O'Connor, which included some of these
9  California attorneys that were assisting Mr. O'Connor in this
10 particular portion of the case.  So I know that they were
11 involved in that part of it.

12         At this point in time, Judge, I mean, it's really
13 unclear how or what effect any sentence whatsoever -- the fact
14 that he pled guilty is probably going to have some sort of
15 effect on his immigration status.  So he knows that that was a
16 part of the plea agreement, that there will be some sort of
17 consequence.  So I don't think -- whatever happens in this
18 particular case, I mean, that's -- the immigration part is
19 going to be separate and going to be dealt with by the
20 attorneys out there in California.

21         So that being said, Judge, whatever the Court
22 decides in this particular instance, just know that Mr. Dewan
23 was not on the same level as the other people that have been
24 charged and pled in front of this Court.  That being said,
25 Judge, I'll leave it up to the Court.

1          THE COURT:  I'm just trying to figure out the level

2     of culpability with this misprision charge.  The PSR alludes

3     to -- on page 5, section 11 -- that Dewan was a long-time

4     associate of Saleem.  I don't know what "long-time" means.  And

5     that he traveled frequently with Saleem.  I'm not sure what

6     that means, if that's extravagant travel or if that's simply

7     from Texas to California.

8          MR. MARQUEZ:  My understanding, that was the travel

9     between, you know, Kansas City, Texas to California.  That was

10    the route that Sunny Saleem took when he started this business

11    here in Kansas City.  He went down to Texas because it was his

12    understanding it was more profitable to be down in Texas to do

13    the K2 business.  And then he had some issues down in Texas

14    with law enforcement, and that's why he went to California.

15    And because Brahm Dewan was friends with him and worked with

16    him in all of these places, Mr. Saleem had him come with him to

17    those different places because he knew he was a hard worker.

18    He knew that he would do whatever he asked him to do.  So

19    that's my understanding of that particular paragraph in the

20    PSR, Judge.

21         THE COURT:  Okay.  So does "long-time associate"

22    mean that he met him back in 2011 or even further back than

23    that --

24         MR. MARQUEZ:  I don't know --

25         THE COURT:  -- if you know?

1    MR. MARQUEZ:  -- if it was further than 2011.  You'd

2  have to ask Mr. O'Connor to comment on that.  But from the

3  beginning of our investigation, he was -- we call him an

4  associate of Mr. Saleem's.  He was not like a business

5  associate where he was involved in running the business.  He

6  was -- again, he was someone we believed Sunny Saleem trusted

7  that he could ask him to do whatever he needed to do, and

8  Mr. Dewan would do that stuff.

9         And again, you know, when he was out in California,

10  I mean, he was making $0.05 a packet.  Now they were making a

11  lot of packets.  But I think from our investigation, the people

12  that were actually filling the packets would get paid per

13  packet.  So however much they did on a given shift, you know,

14  within a week, that's when they would get paid on the packets

15  that they -- that they filled with the K2 to be shipped out

16  across the country.  So hard work.  They weren't making a lot

17  of money.

18         Obviously, in cases like this, and in most criminal

19  drug enterprises, the people down at the bottom aren't making a

20  whole lot of money.  And they're doing a lot of the sweat

21  equity work to get those guys.  And in this case, you see in

22  that small period of time how many millions of dollars were

23  sent through all of these different accounts the IRS were able

24  to identify through the course of this conspiracy.  Obviously,

25  this defendant did not get hardly any of -- any of that kind of

1 money. If you look at the PSR, I mean, he's got outstanding

2 debts. He was not living high off the hog when he was running

3 around with Sunny Saleem because Sunny was able to use

4 Mr. Dewan as kind of an errand boy that would do whatever

5 Mr. Saleem wanted him to do.

6 THE COURT: Do you know -- I'm just curious, it

7 sounds as though the argument that he lived in the basement of

8 a house that it was pretty bad living conditions?

9 MR. MARQUEZ: It was not bad living conditions. He

10 just -- he didn't own his own home. It wasn't like Mr. Saleem

11 paid him enough money that he could have his own apartment or

12 have his own place and then go to work like you and I go to

13 work or have gone to work in our past. It was not a situation

14 like that.

15 THE COURT: I guess my point is if Saleem is making

16 millions of dollars a year, his house is probably not too

17 shabby.

18 MR. MARQUEZ: It was not too shabby, Judge. Not too

19 shabby at all, Judge. My point in saying what I was saying

20 about Mr. Dewan is, you know, he wasn't making a ton of money

21 assisting Saleem in this endeavor. He was just being -- and

22 it's our belief that he was obviously being used by Mr. Saleem

23 and others just to do their low level bidding, picking up

24 packages on his way into work. Those guys -- those other guys

25 that were receiving the packages from New York and other

1  places, those people were getting paid a certain amount of

2  money for every package they got.  Brahm Dewan did not get any

3  money for picking up those packages that had chemicals in them

4  and bringing them to the warehouse in California.

5       So in that sense, Judge -- like I said, I think you

6  got a feel for what he was doing and what his role in this

7  offense was.  He was not making any money.  He was not being

8  treated -- yeah, he lived in a nice house that Sunny Saleem

9  had.  He lived in his basement.  He probably had food to eat.

10 He wasn't, you know, starving for clothes and food and things

11 like that.  But yet he wasn't -- didn't have his own place.  He

12 wasn't -- you know, didn't have the nice cars that Shakeel Khan

13 and Arif Siddiq and Sunny Saleem had.  It was -- it was

14 different from those guys.

15      THE COURT:  And then I just look at another aspect

16 of his culpability.  When the PSR refers to Mr. Dewan actually

17 mixing the chemicals, and he's involved in picking up packages,

18 he's involved in the packaging of the end product, he's signing

19 blank checks, that's -- that sounds more involved than being

20 simply used.

21      MR. MARQUEZ:  All that is true, Judge.  I mean, I

22 think if you look at the magnitude of this conspiracy, that's

23 kind of what I was pointing to as far as his role.  I mean, he

24 wasn't -- you know, he didn't run the conspiracy.  He wasn't an

25 organizer or leader.  He wasn't going out getting migrant

1  workers to come in and work in the factory or in the warehouse.
2  You know, it's my understanding that because of his
3  relationship with Sunny Saleem that that's why he was doing
4  some of those things.

5          Now, did he go from being a packer to mixing the
6  chemicals?  He did.  And I'm not -- I don't know if we've ever
7  asked any of the people involved, you know, why did you pick
8  Brahm Dewan to start, you know, mixing the chemicals up and
9  spraying them on the Damiana leaves.  I don't think we ever
10 asked that question.  But I think it's a natural progression
11 for someone who's been with Mr. Saleem from Kansas City to
12 Texas to California.  And again, as I said, they were making
13 money basically hand over fist.  It would not surprise me that
14 since Mr. Dewan was a trusted person in that circle that they
15 asked him to do more and more.

16         Obviously, on the bank accounts, there are other
17 people that -- that you will hear about in some of the other
18 cases that they did the exact same thing.  They asked, hey, can
19 you open up these bank accounts?  And that's all these people
20 did.  They probably had an idea that it was to be used for
21 nefarious purposes.  In this particular case, I don't know if
22 Mr. Dewan had any idea as far as that is concerned.  He was
23 just a signer when they opened the account.  He was not someone
24 that during our investigation we ever found out, heard about,
25 knew about, anyone told about that he was going to these banks

1  and taking money out and doing things for the conspiracy.  So

2  in that respect, I think he is a little bit different than some

3  of these other people who had multiple accounts for Mr. Saleem

4  and Mr. Arif in California.

5           So it is different for this defendant, but I

6  understand where the Court is getting at when it comes to some

7  of the things he was doing.  It wasn't like he was just one of

8  the migrant workers that got wrapped up accidentally in this

9  case because they were there all the time when a search warrant

10 was served, and then he tells the -- you know, law enforcement,

11 hey, I've been working here for -- you know, I've been working

12 here for a year, this is what I've been doing.  Yeah, these

13 guys are doing X, Y and Z, and I kind of knew this was going

14 on, but, you know, I'm here illegally, so I wanted to make the

15 money, and this is why I'm here, and that's why I stayed here,

16 and that's why I didn't say anything until the law enforcement

17 came and busted the place.  It's different than that.

18          But he was definitely involved with Mr. Saleem.  And

19 again, the PSR is correct, I mean, he was a trusted associate

20 of his.  And that's why he was able to go from place to place

21 with Mr. Saleem and do the things that the PSR says he did is

22 because Saleem trusted him.

23          THE COURT:  All right.  Mr. Dewan, do you have any

24 statements for the Court or for the record regarding the

25 appropriate punishment in this case or any other relevant

1 information?

2          THE DEFENDANT:  No, ma'am.

3          MR. O'CONNOR:  Your Honor, can I make one more

4 statement?

5          THE COURT:  Of course.

6          MR. O'CONNOR:  Judge, just in terms of the

7 conversation that came up about his role expanding to mixing

8 chemicals and that sort of thing.  It brings me back to the

9 proffer session when they were talking about that.  And one of

10 the discussions they had where they were asking him was, did

11 they ask you to put on -- you know, these were dangerous

12 chemicals.  Did you not know they were that dangerous?  And he

13 was saying, well, no, but I remember almost feeling like I was

14 going to pass out.  And they were like, well, they didn't --

15 they were asking him, did they give you any kind of mask to put

16 on?  Did they give you any kind of stuff that would prohibit

17 these chemicals from hurting you?  And the answer was no.

18          And matter of fact, there was a girl -- I think it

19 was a girl or someone that was working with them that had

20 either passed out or done something when they were down in --

21 is it Dallas, I believe?

22          THE DEFENDANT:  Fort Worth.

23          THE COURT:  I saw in the --

24          MR. O'CONNOR:  Where he had called the police.  And

25 it's like, yeah, he was a trusted associate of Saleem, but when

1  you say used, it was like he was because they were never going

2  to put themselves in that kind of harm's way, but they would

3  allow him to be that.  So it was like, you know, he was -- that

4  kind of typifies their use of him was he was disposable in that

5  regard.

6           THE COURT:  Well, that's an aggravator for the other

7  guys.

8           MR. MARQUEZ:  And the factual recitation just now is

9  true.  During that proffer session, that's the information that

10 we learned from him.  And we did know about the incident down

11 in Fort Worth, Texas, where law enforcement was called because

12 one of the ladies had passed out in the area where they were

13 mixing chemicals and spraying chemicals.  And that kind of

14 precipitated their move from Texas to California.

15          THE COURT:  I can't recall where I saw the person

16 passing out in the PSR.  For some reason, I was thinking it was

17 someone unconnected with the business.

18          MR. MARQUEZ:  I think it was, Judge.  There was a

19 business next door to where they were doing this.  I think it

20 was a liquor store.  And I think they were getting the fumes

21 and called law enforcement.

22          THE COURT:  Where is that in the PSR?

23          PROBATION OFFICER:  Judge, I'm trying to find it.  I

24 remember putting it in one of these.  I guess it may be

25 possible that --

1     THE COURT:  It was in this PSR for this defendant.

2     MR. O'CONNOR:  Judge, I think -- on page 4 at the

3 very top, I think it's kind of a generic statement that in many

4 cases, these users were -- had been hospitalized, had erratic

5 behaviors.  I think it was a general --

6     THE COURT:  No.  It was something more specific.

7     PROBATION OFFICER:  It was in paragraph 18 on page

8 6, I think.

9     THE COURT:  Oh, yes.  An employee of a business that

10 adjoined Saleem's MK Paradise warehouse became unconscious

11 after inhaling the chemical fumes from the warehouse.  Okay.

12     Anything further from the government?

13     MR. MARQUEZ:  No, Your Honor.

14     THE COURT:  From the defense?

15     MR. O'CONNOR:  No, Your Honor.  Thank you.

16     THE COURT:  Pursuant to the Sentencing Reform Act of

17 1984, it is the judgment of the Court that the defendant, Brahm

18 Dewan, is hereby committed to the custody of the Bureau of

19 Prisons for 21 months on count 1 of the information.  This is a

20 low end of the advisory guideline range and is appropriate when

21 considering Mr. Dewan's lack of a criminal history, the level

22 of his involvement in the offense, and the seriousness of the

23 offense.

24     Upon release from imprisonment, Mr. Dewan shall be

25 placed on supervised release for a term of one year.  Since the

1  Court finds that Mr. Dewan does not have the ability to pay a
2  fine, the fine is waived.  It is further ordered that he shall
3  pay to the United States a special assessment of $100, which
4  shall be due immediately.

5      While on supervised release, Mr. Dewan shall comply
6  with the mandatory and standard conditions that have been
7  adopted by the Court.  In addition, Mr. Dewan shall comply with
8  the special conditions listed in part D, section 88, of the
9  presentence investigation report.

10     There are no counts to be dismissed.  Is that
11 correct?

12     MR. MARQUEZ:  That's correct, Your Honor.

13     THE COURT:  Does the original indictment regarding
14 this defendant need to be dismissed as against him?

15     MR. MARQUEZ:  I'll double check on that, Judge, and
16 if it does, I'll get it dismissed.

17     THE COURT:  All right.  For the record, any charges
18 stemming from that indictment regarding this defendant are
19 dismissed.

20     Mr. Dewan, I must advise you of your appellate
21 rights.  To the extent you have not waived your right to appeal
22 your finding of guilt and the sentence pursuant to the written
23 plea agreement, you have only 14 days from the date of today's
24 judgment in which to file a notice of appeal.  If you do not
25 file that notice within 14 days, you will forever lose your

1   right to appeal.  If you so wish, Mr. O'Connor or the Clerk of

2   the Court can immediately file that notice on your behalf.  You

3   can also file that notice yourself or have someone close to you

4   file that notice.

5          Is the government agreeable to a voluntary

6   surrender?

7          MR. MARQUEZ:  Yes, Your Honor.

8          THE COURT:  And what is your recommendation,

9   Mr. O'Connor, as to how much time he needs to surrender?

10          Ms. Wheeler, do we usually set those about 45 days

11   out?

12          THE COURTROOM DEPUTY:  Yes, Judge.

13          MR. O'CONNOR:  Judge, I think that would be fine,

14   45.

15          THE COURTROOM DEPUTY:  That would be Friday, March

16   15th.

17          THE COURT:  And where does he need to go?

18          PROBATION OFFICER:  After the conclusion of the

19   hearing, he'll have to go down to the marshals facility, and

20   they'll provide him with everything he needs to know as far as

21   a facility.

22          THE COURT:  Okay.  Mr. Dewan is to surrender to the

23   marshals pursuant to their instructions on Friday, March 15th,

24   2019, as directed.

25          Anything further from the government?

1          MR. MARQUEZ:  No, Your Honor.

2          THE COURT:  Anything further from defense?

3          MR. O'CONNOR:  No, Your Honor.  Thank you.

4          THE COURT:  We'll be in recess.

5              (Proceedings concluded at 2:51 p.m.)

6                          * * *

7                       CERTIFICATE

8          I certify that the foregoing is a correct transcript

9     from the record of proceedings in the above-entitled matter.

10

11    April 4, 2019

12

13

                         /s/Jean M. Crawford
14                       JEAN M. CRAWFORD, RDR, CRR
                         United States Court Reporter
15

16

17

18

19

20

21

22

23

24

25